# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY.

### MARCH TERM, 1869.

~~~~~~~~~~~~~

THOMSON'S EXECUTORS, appellants, and NORRIS and others, respondents.

1. A bequest to "*benevolent*, religious, or charitable institutions" is void, as it embraces, by force of the term "benevolent," objects which are not, in a legal sense, charities.

2. The common law, as interpreted in decisions founded on the statute of 43 *Elizabeth, ch.* 4, prevails in this state with respect to the question, what constitutes the legal definition of a charitable use?

*Quare.* Whether a power to appoint a fund among *strangers* to the donee of the power, after the expiration of a life interest in the fund given to such donee, is a power in gross, and, therefore, extinguishable?

3. But conceding such power of extinguishment to exist, the donee of the power cannot release it, without the consent of all the appointees, for a consideration of benefit to himself.

4. A donee of a power, having a life interest in the fund, and having made an arrangement with the next of kin of the donor as to the distribu-

tion of such fund between herself and them, such arrangement sustained on the ground that it had been validated by an act of the legislature, although some of the appointees under the power were infants, and could not consent to it.

John R. Thomson, by his will, dated July 20th, 1862, after giving certain legacies, directed as follows : " And I further direct, that from the income of the residue of my estate there shall be paid an annual sum of $10,000, payable semi-annually, to my wife, Josephine A. Thomson ; and I authorize and empower my said wife, by her last will and testament, duly executed, to direct, limit or appoint, give or devise the portion of the estate so appropriated for an income of $10,000 a year for her support, to give or devise the same to and among all and every the children of my sisters, Caroline Norris and Amelia Read, and their children, in such proportions and for such estate or estates as she may think proper; or, if my wife so chooses, she may, by her last will and testament aforesaid, direct, limit or appoint, give or devise the same to and among my sisters, Caroline, Adeline, and Amelia, and their children, and grandchildren, and my brother, Edward, in such proportions and for such estate or estates as she may think proper ; and my said trustees, their heirs, executors, and administrators, are hereby required to pay, assign, convey, and transfer the same to the said appointees, according to the directions, limitations, and appointments, gifts, and devises in the said last will of my said wife.

" And I further direct, that if the income from my estate, after the payment of the bequests herein before made, shall exceed the sum of $10,000 a year, that the surplus be invested in good securities; and that my said wife, Josephine, shall be authorized and empowered, by her last will and testament, to give and devise the same among such benevolent, religious, or charitable institutions as she may think proper; and in default of such directions, limitations, and appointments, and so far as the same shall not extend, then to pay, assign, convey, and transfer the residue to my said three sisters, Caroline, Adeline, and Amelia, and my brother,

Edward, their heirs, executors, and administrators, as tenants in common, to whom I give and devise the same."

The widow and the brother and sisters of Mr. Thomson, the testator, in the belief that the provision in the will in favor of benevolent, religious, or charitable institutions was void, on the 3d of April, 1868, entered into a sealed agreement whereby it was provided, that after the payment of debts, the expenses of administration, and the specific and pecuniary legacies, the estate of the testator should be divided between them; the widow, Mrs. Thomson, to take two thirds, and the brother and sisters of the testator to have the remaining third; and in consideration thereof Mrs. Thomson released, surrendered, relinquished, and yielded up her powers of appointment and covenanted not to exercise the same. In this agreement, each party requested the executors to pay to the other the share thus agreed upon, and stipulated to execute to them all proper releases and discharges.

By an act of the legislature of 10th of April, 1868, reciting this agreement, the powers of appointment in the will were declared ended and determined, and the agreement ratified and established, and the executors were authorized to carry out and effect the settlement agreed upon.

The executors, being unwilling to incur the risk of yielding up the trust funds, except upon a judicial sanction, this suit was brought to compel a distribution of the estate in conformity with the agreement between the widow and the brother and sisters of the testator. The prayer of the bill was, "that the defendants, trustees, may set forth a just and true account of the present subjects of the trust now in their hands as such trustees, and that they may be compelled, by the decree of this honorable court, to pay, assign, convey, and transfer the same to and among the said several parties to the said agreement, in the shares and proportions therein mentioned."

The decree appealed from declared the agreement valid,

and directed a distribution of the funds in accordance with its provisions.

The opinion of the Chancellor is reported in 4 *C. E. Green* 308.

*Mr. Wm. Henry Rawle,* (of Philadelphia) for the executors, appellants.

I. The trustees under Mr. Thomson's will are bound, as well by the confidence which their testator has reposed in them, as by the oath which they have taken as executors, to defend the trust which that will has created. They have, and can have no discretion in the matter—no personal feelings or views. The will is not their's, it is their testator's, and unless its provisions are unlawful, they are bound to carry them into effect. If the testator's family think that they could have made a better will, and, consequently get together and execute what they call a " family settlement," and then ask for the decree of this court to carry it into effect, they can only succeed on the ground of the will itself being intrinsically defective. The class of cases of which *Stapilton* v. *Stapilton,* (1 *Atkyns,* 2; 3 *Lead. Cases in Equity,* 684) is the leading one, never went so far as to substitute a family settlement for a will, and to allow the latter to be repealed by the former.

As a mere family settlement, therefore, the case of the complainants has no especial merit.

II. If such be the case, no such act of the legislature as has been passed can give it validity as against the will of the testator. That will has created certain trusts, and if those trusts are valid, no legislative act can give validity to a family bargain by which they are agreed to be considered as invalid. The safety of every state requires that the difference between the judicial and the legislative branches of government should be sharply drawn, and if the trusts created by this will be in themselves valid, and a chancellor should deem himself bound to refuse to substitute the

settlement for the will, the legislature cannot rush in where the judiciary has feared to tread.

But it is urged that the act takes away no vested interest or vested estate, and therefore that under the authority of *Croxall* v. *Sherrerd*, 5 *Wallace* 268, and other cases of this class, it can validate an agreement made between all the parties now *in esse*.

But the distinction is familiar between legislative acts which operate as modes of assurance—which give powers of sale—which unfetter restrictions—which confirm defects, and legislative acts which divert the channels of the testator's bounty—which take away property from one person and give it to another. All the cases referred to are of the former class; not a case can be cited in which an act of the latter class has ever been sustained; and when this statute of April 10th, 1868, undertakes to approve and confirm the release by a donee of a power which is purely collateral, it is simply an act of confiscation of that power, and a repeal of a settled principle of the common law from the Year Books down. Unless, therefore, the trust is in itself bad, no act of the legislature can, it is submitted, have any operation whatever.

III. We, therefore, come down to the investigation of the will itself.

*a.* There are two powers of apppointment given to the widow: one, a power to appoint the *corpus* of her annuity to the testator's family, which is a power in gross; and the other a power to appoint the surplus income accumulated at her death (in which she has, and can have no interest whatever) to certain institutions, and this is a power purely collateral.

As to the former power, the authorities seem to decide that it may be released in favor of the ulterior objects of the appointment; and if the widow had made a settlement with the appointees under *that* power, it is probable that no subsequent execution of the power, inconsistent with the

terms of this settlement, would be supported either at law or in equity.

*b.* It is far different in the case of a power simply collateral. From the case printed by Mr. Sugden from the Year Book of 14 *Henry* 7, and from Digge's case which followed it, down to this day, the authorities are consistent that such a power cannot be suspended, released, or extinguished. The claim, then, of these plaintiffs, must be based upon the invalidity of the power itself.

At this day, the general principles of the law of charitable uses are familiar to all. Trusts that would be invalid as to other objects, are supported in favor of charities—the rule against perpetuities has yielded in their favor—and when the charities themselves which the testator has named have, from particular reasons, been disabled from taking, others have been substituted, and thus a fund for the erection of a Jews' synagogue has been transferred to a foundling hospital. The law has followed the gospel in the prominent position which it has given to charity.

The class of cases of which Morice v. The Bishop of Durham, decided by Sir William Grant in 1804, and affirmed by Lord Eldon in 1805, is the leading one, took the distinction between objects which *might* indeed be charitable, but which *might* also be much more or much less. The trust was for such objects of "benevolence and liberality" as the Bishop of Durham should approve, and this was held bad, not because it did not include objects of charity, but that it included more, and being indivisible, was therefore bad for uncertainty.

Then followed the cases, cited by the complainants, of *James* v. *Allen*, 3 *Mer.* 17; *Williams* v. *Kershaw*, 5 *Clark & Fin.* 111, note; *Ellis* v. *Selby*, 1 *Mylne & C.* 286 (where the bequest was to " such charitable or other purposes;") and *Williams* v. *Williams*, 5 *Law Journal*, ch. 4.

It is principally upon the authority of *Williams* v. *Kershaw*, decided in 1835 by Lord Cottenham, that the complainants ask for a decree. The devise was to " such benevo-

lent, charitable, and religious purposes as the executors should, in their discretion, think most advantageous and beneficial." The decision is not reported at length, and but one part of the reasoning is given: "It is argued, in order to prove the gift to be good, that the terms must be taken conjointly; if so, every application must be to a religious purpose, which would no doubt be benevolent, and, in a legal sense, charitable; but the question is, did the testator so consider it? Did he mean that there should be no application of any part of the residuary fund, except to religious purposes? Such does not appear to me to be his intention: he intended to restrain the discretion of the trustees, only within the limits of what was benevolent, or charitable, or religious. If this be the right construction, then the question is, what the decisions have ascertained to be the rule on the subject." And after referring to the authorities already cited, and to three others, the decision was that the gift could not take effect, and that the residue was undisposed of.

Those cases are *Waldo* v. *Caley*, 16 *Ves.* 206; *Ommaney* v. *Butcher*, *Turn. & Russ.* 260; and *Vezey* v. *Jamson*, 1 *Sim. & Stu.* 69.

*Waldo* v. *Caley*, decided by Sir W. Grant in 1809, was a bequest of money to be spent "in promoting charitable purposes, as well those of a public as a private nature, and more especially in relieving such distressed persons, either the widows or children of poor clergymen, or otherwise as his wife should judge most worthy and deserving objects, giving a preference always to poor relations;" which was held to be good.

In *Ommaney* v. *Butcher*, (decided by Sir Thomas Plumer, in 1820,) "in case there should be any money remaining," said the testator, after making sundry bequests to charitable institutions, "I should wish it to be given in private charity." This bequest was held to be bad.

The authority of this decision has been much questioned, (see *Boyle on Charities*, 294) and it seems to have been shaken by the later case of *Horde* v. *Earl of Suffolk*, 2 *Mylne &*

*Keene* 59, decided in 1833 by Sir John Leach, where the income of a perpetual fund to be "given away in charity, either to individual persons or to public institutions, in such sums, ways, and manner as the trustees should think fit, without any interference or control;" and it was held that the case was not distinguishable from *Waldo* v. *Caley.*

*Vezey* v. *Jamson* was decided by Sir John Leach in 1822, and in that case a bequest of the residue to executors, to dispose of at their pleasure, either for charitable or public purposes, " or to any person or persons in such shares, &c., as they should think fit," was obviously held bad.

The complainants' brief suggests that Mr. Boyle, in his treatise on the law of charities, admits the correctness of this decision if the change of the disjunctive preposition be correct, which he doubts; but a consideration of all the author's strictures on the decision seems to show that his doubts had a much wider range, though, as is well known, there is not, with English text writers, the same free spirit of criticism of adjudicated cases which prevails here.

But the language in *Williams* v. *Kershaw* differs from that used in this case. There it was, " to such benevolent, charitable, and religious *purposes.*" Here it is, " to such benevolent, religious, or charitable *institutions.*"

In *Hill* v. *Burns,* 2 *Wilson & Shaw* 80, the bequest seems to have been to trustees, " in aid of the *institutions* for charitable or benevolent purposes established or to be established in the city of Glasgow or its neighborhood;" and it was thought that the term *benevolent* would not bear any other meaning than charitable, being employed in favor of a public institution. It was, therefore, a mere redundancy of expression, and did not communicate any ambiguity to the gift, which was accordingly upheld.

In *Miller* v. *Rowan,* 5 *Clark & Fin.* 99, decided in the House of Lords, in 1837, the bequest of the residue was to trustees, to distribute the same to such charitable and benevolent purposes as they should think proper; and Lord Brougham, in delivering the judgment, said : " Is this gift validly

given to charitable uses? The maker of the deed first says, that the residue shall be applied by the trustees to such benevolent *and* charitable purposes as they may think proper. Suppose we read 'and,' 'or;' the authorities in the Scotch law do not entitle us to hold that this is so uncertain as to be void. In Hill v. Burns, decided by this house, the fund was to be distributed among institutions established or to be established in Glasgow or its neighborhood, 'for charitable and benevolent purposes,' the same words; this was held sufficiently certain by the Court of Sessions, and their judgment was affirmed by your lordships. Indeed, the distinction between charitable and benevolent uses was not taken in that case, and there appears nothing in the authorities on this subject which should lead us to suppose that the Scotch law has ever given the technical meaning to the word 'charity' or 'charitable,' which our English law has given since the statute of Elizabeth. It is true that, in Hill v. Burns, institutions in or near Glasgow are named, but I am now citing the case on the use of the word 'benevolent' only. For that nothing can turn upon the generality of the words in the present case, namely, 'charitable purposes,' if the addition of benevolent does not vitiate the gift, appears clear from the latest decision of the house, that in Crichton v. Grierson, where it was held, after a careful consideration of all the authorities by the noble and learned lord who then presided, that a gift to trustees, to be applied to such charitable purposes as they shall think fit, is good by the law of Scotland. The addition in that case, of bequests to friends and relations, was much relied on in the argument at the bar and in the printed cases, but it does not form the ground of the decision. My noble and learned friend, Lord Lyndhurst, expressly held that charitable purposes would be sufficient by the law of England, and that the Scotch law is less strict than ours in this respect, of which, indeed, there can be no doubt."

The latest cases show a disposition to restrict the rule of Morice v. Durham. In *Whicker* v. *Hume,* 14 *Beavan* 509,

T *

the testator, who had long resided in the east, and was skilled in Oriental languages and literature, left a fund to trustees to be appropriated " as in their uncontrolled discretion they should think proper and expedient, for the benefit, advancement, and propagation of education and learning in every part of the world, as far as circumstances would permit."

It was objected to this bequest, that inasmuch " as those purposes alone are considered charitable which the statute of Elizabeth enumerates, or which, by analogies, are deemed. within its spirit and intendment, this gift was too large, as the only 'learning' mentioned in the statute is 'schools of learning,' and the only 'education,' 'the education of orphans;'" and after referring to the cases of Williams v. Kershaw, Ellis v. Selby, &c., it was urged that the bequest embraced the whole sphere of literature and science, in any civilized or uncivilized country; the fund might be given to a distinghished French astronomer or an Indian brahmin, and it would be impossible for the court to regulate its application. But it was held by Sir John Romilly, M. R., (1851,) that the trust was not too indefinite, and that, if necessary, the court would compel the proper application of the fund by the trustees, and this decision was, in 1858, affirmed in the House of Lords, (7 *Clark's Appeal Cases* 124,) Lord Chelmsford, Lord Cranworth, and Lord Wensleydale all concurring that the testator meant to use the word learning as connected with education.

In the present case, therefore, it may well be presumed that the testator did not intend to use the words " benevolent institutions," otherwise than so far as they were charitable or religious.

But, under any circumstances, it may well be doubted if there is any benevolent institution, in the proper and legal sense of those words, which is not also a charitable institution. The word institution means, in this connection, a lawful institution, one whose existence consists in perpetual succession for the purposes of general and public benevo-

lence, and every such institution must necessarily be a charity.

*Mr. Robeson,* Attorney-General, for respondents.

I. The powers of appointment, claimed to be in his widow, under the will of Mr. Thomson, are (to the extent to which they exist at all,) either powers " collateral or in gross," or powers " simply collateral."

They are " in gross " if the widow had, or is given any interest in the thing to be appointed; or if the power is to be exercised for her benefit in any way; and this is so whether her interest be legal or equitable.    1 *Sug. on Powers* 40, 44.

The power to appoint the portion of the estate appropriated to produce her income of $10,000, is a power " in gross," and as such determinable by the donee; and the principle applies to personal as well as real estate.    1 *Sug. on Powers* 79, 89, 90, 91, 98; 2 *Sug. on Powers, appendix, No.* 4, 569; *Albany's case,* 1 *Rep.* 111; *Smith* v. *Death,* 5 *Madd.* 371; *West* v. *Berney,* 1 *Russ. & Myl.* 431; *Bickley* v. *Guest, Ibid.* 440; *Horner* v. *Swan, Turn. & Russ.* 430; *Miles* v. *Knight,* 12 *Jur.* 666; *Hillyard* v. *Miller,* 10 *Barr* 326.

But it is said that the power to appoint the accumulated income " among such benevolent, religious, or charitable institutions as she may think proper," is not a power to appoint out of an estate in which she has any interest, and is therefore not a power " in gross," but a power " simply collateral," and that the release of such power by the donee is ineffective.

This argument fails : 1. If the power itself is found to fail, or is frustrated by reason of any organic defect.    2. If, though found to be valid, it shall be shown to be a power " in gross," and thus determinable at the will of the donee. 3. If, though found to be a valid power " simply collateral," it is also found that, not amounting to a direction of the testator, it is determined by the action of all the persons interested in or with power over the estate, concurring in a family settlement, established and confirmed by an act of the legislature.

II. This power is not valid, on the general principles applying to bequests generally, and it will fail, unless brought within the requirements of some favored class of bequests·

It is void for uncertainty in its objects. Generally, where the terms of a trust are such that the objects of it cannot be surely fixed by the court, it will fail for uncertainty. 2 *Story's Eq. Jur.*, § 979, 1183; *Fowler* v. *Garlike*, 1 *Russ. & Myl.* 232; *Ommaney* v. *Butcher*, *Turn. & Russ.* 260–71; *Stubbs* v. *Sargon*, 2 *Keen* 255; *Baptist Association* v. *Hart's Ex'rs*, 4 *Wheat*. 1, 33, 43.

The power is void, also, as in conflict with the law against *perpetuities.*

Generally any trust is void which ties up property to a single purpose, or in a single line, so that its disposable and distributable nature is destroyed, for a longer than the reasonable period fixed by law. *Lewis on Perpetuities*, 169, 688, 708; *Owens* v. *Miss. Soc.*, 4 *Kern*. 380; *Hillyard* v. *Miller*, 10 *Barr* 326.

The single extraordinary exception to the operation of these two general principles, which are established on the highest grounds of public policy, is in favor of "*charities*."

It follows that this provision cannot stand, except as an extraordinary exception·

But no use is a "charitable use," except it be technically such, according to the rules established on this subject.

No provisions are within the exception in favor of charities, and therefore valid, "except such as are for the purposes enumerated in the statute of 43 Elizabeth, or are within its spirit and intendment." They must be within the specific enumeration of objects in the statute to entitle them to be upheld. 2 *Story's Eq. Jur.*, §§ 1155, 1158, 1164; *Brown* v. *Yeall*, 7 *Ves*. 50; *Kendall* v. *Granger*, 5 ·*Beav.* 301; *Williams* v. *Williams*, 4 *Seld.* 547; *Owens* v. *Miss. Soc.*, 4 *Kern*. 397, 403–4.

We have no magistrate authorized to settle a scheme of charity under his sign manual, and the *cy pres* power, rather a sovereign than a judicial one at all times, is not recognized

by our court. *Williams* v. *Williams*, 4 *Seld.* 548; *Beekman* v. *Bonsor*, 23 *N. Y. R.* 298, and Curtis Noyes' argument, in appendix to same volume; *Owens* v. *Miss. Soc.*, 4 *Kern.* 387–8, 407–8, 410.

Thus the use must not only be clearly "charitable," but it and its beneficiaries must be so far defined that it can certainly be specifically executed by the court, or by some ascertained and surely competent trustee; or it cannot be executed by any means within the power of our Court of Chancery, and will thus fail.

Any "charity" not strictly within these requirements, can only be executed, if at all, by the authority of the legislature as "*parens patriæ.*"

III. This is not a good power, because the object of the appointment is not *necessarily* a legal "charity," and so not within the exception.

Because, while there is no ascertained trustee competent to execute the trust, and no particular beneficiary object pointed out, the special characteristics of the general objects named are neither defined by the bequest, nor are the objects limited to the state of New Jersey, and thus so confined that their characteristics may be certainly fixed by our courts.

The characteristics of the objects of the power must be such as to make a legal "charity," under the laws of New Jersey.

Heirs-at-law are not to be disinherited by conjecture, but by express words, or necessary implication. *Thomas* v. *Thomas*, 6 *Term R.* 671.

Bequests to the charities outside of their jurisdiction have indeed been sustained by the English courts, but only to a known trustee, and in cases where the special characteristics of the charity were defined by the will, "so that the extensive character of the gift was obviated by limiting and specifying the subject upon which the discretion of the trustee is to be exercised." *Whicker* v. *Hume*, 7 *H. L. C.*

155; *President of U. S.* v. *Drummond,* (case of Smithsonian Institute.)

There is no limitation here of the exercise of this power to any specific "charity," nor are the characteristics and conditions of the general objects named so defined in terms that they will certainly have, by their own limitation, the qualities of a legal charity under our laws; nor is the power so confined within the control of our courts that these qualities are thus assured.

It must therefore fail, unless it may be saved by construing the words, "such benevolent, religious, or charitable institutions as she may think proper," to mean institutions *within the state of New Jersey.*

If this cannot be done without limiting the scope of the testator's aims, as he expressed them, then the testator has attempted too much, and so failed to make a good power.

A "benevolent, religious, or charitable association" is not necessarily an incorporated society, and two defects in this power are thus developed.

A gift to a voluntary association is not necessarily a trust —certainly not for any defined purpose; and a gift to a voluntary charitable association is not necessarily a charitable use. *Owens* v. *Miss. Society,* 4 *Kern.* 385.

Only a corporation can, by force of its own succession, transmit the fund in perpetual succession, according to the design of the bequest; and since the choice of institutions is not limited to the state of New Jersey, and may fall on a voluntary one, there can in such case, should it happen, be no appointment of a new competent trustee from time to time, by the only power competent for that purpose, *viz.* our Court of Chancery. *Williams* v. *Williams,* 4 *Seld.* 549.

But, besides these objections, this power is radically defective, because the language of the bequest does not *confine* the power to a charitable use.

This bequest leaves a wide latitude of choice to the donee, outside of what the law protects as charities. The words are "such benevolent, religious, *or* charitable institutions as she

may think proper." Unless all these are "charities," then the donee has discretion outside of "charities." In such case the bequest is no longer protected, and it falls before the rights of the heir, and the law against perpetuities. The decisions of the courts are in accordance with reason and principle on this question.

A power of appointment for "charitable and *other* purposes" is void. *Ellis* v. *Selby,* 7 *Sim.* 352; 1 *M. & C.* 286. And so even if these other uses must be public, a power to appoint to "charitable and *public* uses" is void. *Vezey* v. *Jamson,* 1 *Sim. & Stu.* 69. So a power to appoint to "benevolent purposes." *James* v. *Allen,* 3 *Mer.* 17. "To objects of benevolence and liberality." *Morice* v. *Bishop of Durham,* 9 *Ves.* 399, and 10 *Ves.* 521. And so "benevolent, charitable, and religious purposes," are not necessarlly charities, and a power to appoint to them will not be sustained. *Williams* v. *Kershaw,* 5 *L. J. R.* (*N. S.*) 84; 5 *Clark & Fin.* 111, note; *Whicker* v. *Hume,* 14 *Beav.* 509; 7 *H. L. C.* 124.

The conclusions of this case are the logical consequences of the established principles on the subject. Let us apply them to the case before us.

"Religious" purposes, according to the English policy, are "charitable" purposes, and are protected as such. As the greater includes the less, the whole effect of the word "religious" is included in the word "charitable," though the converse of the proposition is not true; we may, therefore, eliminate the word "religious," and the language remains, "benevolent or charitable."

Again, all "charitable" purposes are "benevolent" purposes, though the converse is not true. Again, the greater includes the less; and, for the purpose of confining the discretion of the donee, the effect of the two words is the same as if the word "benevolent" stood alone.

But we have already seen that a power to appoint to "benevolent" purposes simply, is, on principle and precedent, void. *James* v. *Allen,* 3 *Mer.* 17.

But a distinction may be sought in this case, because the words "benevolent, religious, and charitable *institutions*" are used; while in the case of *Williams* v. *Kershaw* the word is "purposes." I cannot find any distinction which will affect the principle.

The formal body which would constitute an "institution," would be only competent as a trustee for the purposes of it; and the power amounts to nothing more than a power to appoint to trustees for such "benevolent, charitable, or religious" use as the donee may think proper.

Again, a power to appoint to *any person* the donee might think proper, would be void; so a power to appoint to *any institution* the donee may think proper, would be void.

The word "institutions," then, will not save the power, unless it be necessarily a legal charitable institution.

A gift to a trustee for an object, is a gift for the object itself; thus benevolent institutions are not necessarily "charitable" institutions, such as the courts will uphold, any more than all benevolences are legal "charities."

The case of *Hill* v. *Burns*, 2 *Wilson & Shaw*, where the bequest was "in aid of institutions for charitable or benevolent purposes," the decision did not depend in any way on the word institutions, but was merely that the Scotch courts were not governed by the statute of Elizabeth, and did not give the same technical meaning to the word "charity" which the English courts did. This is apparent from the opinion of Lord Brougham in *Miller* v. *Rowan*, 5 *Clark & Fin.* 99.

IV. This power, if valid at all, is a "power in gross," and may be released by the act of the donee.

The whole "residue" of the estate, after payment of the specific legacies, is the "portion appropriated" by the testator to secure the annual income of his widow, and having an interest in the whole, her power to appoint the "surplus" income of it, is a "power in gross."

That the whole of the residue is provided as the "corpus"

of her annuity is evident from the language and implications of the will.

V. But whatever is the particular nature of this power, it is determined by the settlement of the estate made between the parties, and confirmed and established by the act of the legislature, which settlement the complainants in this suit ask may be carried out.

This settlement is a family settlement, concurred in by all the persons interested, of adverse claims *prima facie* of doubtful character, in regard to an estate in which the parties are all interested, as of the blood or immediate family of the testator, and in such character, beneficiaries under his will; which settlement was made for the prevention of present family difference and future litigation.

By this settlement no violence is really done to any intention of the testator expressed in his will.

It is concurred in by all the *fixed* and *ascertained* objects of his bounty; all the persons who have any claim to any benefit under the power relinquished, or control over the estate under the expressed intentions of the will.

The will contemplates the *possibility* of other objects, but wholly at the *option* of the widow. The fact that there shall ever be any such objects, is not insisted upon or assumed by the will; nor is their identity ascertained, if by possibility they shall hereafter exist. So far as the attention of the widow is pointed towards any object outside of the actual persons above enumerated, she was still left a complete option, of choosing or refusing, as well as in the choice of objects.

No other person or object than those enumerated can be said to have any, even moral, claim on the widow's action under this power, much less any legal interest under the will, while the widow has not acted.

The settlement is for the benefit of all. The will shows that the testator meant to benefit *all*, to the extent that all

could be benefited without reducing the measure of the widow's portion or lessening her control over the surplus.

This settlement, then, is a *family settlement* for a favored object, between all the parties having any interest in the estate or power over it, for the mutual benefit of all, attaining by its result an end to which all the definite provisions of the will are directed, and by means which destroy no *possibility* of interest, which the testator did not himself leave dependent for its possible existence on the will of those who, by this act, deny it. It thus fulfills all the conditions of favor which any family settlement can present, and will be sustained, if within the power of the court to do so. 1 *Story's Eq. Jur.*, § 131; *Stapilton* v. *Stapilton*, 3 *L. C. in Eq.* 684, and cases there cited.

VI. The legislature of the state of New Jersey has passed an act specifically to declare and effect the extinguishment of this power.

This law is both *declaratory* and *active*. It not only *declares* that the *release* is, under the circumstances of this case, effective to extinguish and determine the power, but *itself acts* to extinguish and determine it.

The direct accomplishment of this purpose was within the power of the legislature by means of a law. Our state legislature possess like powers with the English parliament, except where restrained by, or by reason of some provision of the federal or state constitution.

They possess, as the representatives of the people, the law-making power wherever the organic law does not restrain it. *Sedgwick on Const. Law* 184–5; *Cochran* v. *Van Surlay*, 20 *Wend.* 381; *Kirby* v. *Shaw*, 7 *Harris* 258; *Sharpless* v. *The Mayor, &c.*, 21 *Penn.* 147, 162.

Besides this, they are the general representatives of the people, clothed with all the powers which belong to them as a political community. They represent *all* the attributes of sovereignty, except mere executive power.

The law itself is a declaration by the body representing

the inherent power of the state, that the subject matter is within its control, and that its action thereupon is in accordance with right; and question of this by the courts would be the assumption of law-giving power. *Sedgwick* 183. *Bennett* v. *Boggs, Bald.* 74, 75. But it is not necessary to insist upon any extraordinary power in the legislature to sustain this law. It will be conceded, that it was within the power of the legislature to pass the law unless it divests or affects some "vested rights."

A vested right, is a right which belongs to *some person.* A right can't belong to any *person*, if there is no person in being for it to belong to. That which does not actually exist at all cannot be said to be a *right* which belongs to any person. A right to which no one has any special claim more than any one else, does not *belong* to any person.

No right, then, can be said to be vested under this power. No right can be vested, the very existence of which depends upon the *future* exercise of an *independent* will. Nor can any person claim a vested right in an interest, the recipient of which remains to be designated.

All the parties in being who have any, even contingent, interest in any existing right to be affected by the exercise or surrender of this power, are parties to the settlement, confirmed by the act, and had done all that they could to accomplish what the act effects. Thus, there is no interest, even contingent, affected adversely by the act.

Inchoate rights are within the power of the legislature. *Butler* v. *Palmer*, 1 *Hill* 320.

But acts, both general and special, which affect and destroy contingent interests, are to be found in the statute book of every state, and have been recognized by every court.

The whole system of barring entails by fine and recovery, was of like character. The principle is, that every person interested *at the time* consents, without regard to any contingent interest, dormant and unattached. That method of alienation was a judicial invention to destroy perpetuities, and "the legislature could exercise the same power not only

by general law but by special act," and without the inter-
vention of any legal fiction. Opinion of Justice Grier, *Croxall*
v. *Sherrerd*, 5 *Wall.* 268.

VII. Particular instances, stronger than the present one,
are easily found. *Holdbrook* v. *Tenny*, 4 *Mass.* 566; *Bing-
hardt* v. *Turner*, 12 *Pick.* 539; *DePeyster* v. *Michael*, 2
*Seld.* 467, 503; *Satterlee* v. *Matthewson*, 2 *Peters* 380; *Goshen*
v. *Stonington*, 4 *Conn.* 209; *Mather* v. *Chapman*, 6 *Conn.*
54; *Black* v. *Wilkens, Ibid.* 197.

In our own state, the law of 1780, which altered the
devolution of estates by abolishing primogenitures; the law
of 1817, which took away the double share from the sons;
were very similar to this in effect.

These interests were not vested, perhaps not even contin-
gent interests, but they had more real existence than any
interest under this power, for the expectant heirs were ascer-
tained or ascertainable by the operation of fixed and natural
causes, and their shares would of necessity descend in default
of an affirmative act (a legal will) preventing; here there
is no ascertained or ascertainable person, and no interest
which will come by force of law, or without some *future,
optional, affirmative* act.

But special acts in our own state which divest the interest
of the heir in tail, at times when that interest was secure
without the action of the legislature, have been more than
once passed, and recognized by the courts. *Croxall* v. *Sher-
rerd*, 5 *Wall.* 268; *Kearney* v. *Taylor*, 15 *How.* 494; *Rich-
man* v. *Lippincott*, 5 *Dutcher* 44.

In these cases the contingent interest of the heir in tail
was disregarded, though it depended on contract, and could
not be destroyed by any act of the parties agreeing, but
*must* come of course, except for the act of the legislature.

The truth is that this law is not retroactive on any *interest,*
but only on the *power*, and that only to the extent desired
by the person who possesses it. It is merely an *enabling*
act in its nature, authorizing Mrs. Thomson to do *now* an

act which she has a right to do whenever she is authorized to act; enabling her to accomplish a result *now* of which no one has any right to complain, because the right to accomplish the result is hers, and cannot be taken from her *by lapse of time.*

VIII. The confirmation of this release is the more surely within the power of the legislature, since they are the representatives and guardians (as the representatives of the sovereignty,) of all public interests, and especially all general charities; all charities while they remain uncertain. 2 *Story's Eq. Jur.*, § 1190.

The legislature in such case, in its double capacity of lawmaker and sovereign guardian of the interest of charities, may, by proper act, consent; not to. relinquish any interest of any kind, for none exists; but that Mrs. Thomson may exercise *now* a right which is hers to exercise *hereafter.*

Thus, when the legislature became a party to this settlement, not only every present interest and every contingent interest, but every possible interest under this power, consents to the release and the act confirming it.

IX. But if the legislature could not, by virtue of any power over the subject itself, determine the power, it certainly could provide and declare the incidents which should, in New Jersey, attach to such a power as this.

It would certainly have been competent for it to provide and declare, by general act, that all powers of appointment, presenting conditions and circumstances like this one, might be released by the donee. Under such an act, not retroactively affecting any interest or right, a subsequent release of this power would have certainly been effective.

What the legislature may authorize they may sanction and confirm when done.

X. The courts will give effect to an act of the legislature if it can be done on any legal principle.

2 U*

This act will be sustained and will be sufficient: if it can be held to be effective to determine this power by direct exercise of the law-making authority; or, if it is effective as a release of the *parens patriæ;* or, as a declaration and provision that the circumstances of this power make a "power in gross;" or, as a provision that all optional powers of appointment which, though "simply collateral,"·do not amount to a direction, may be released by the person at whose option they are to be exercised; or, as a declaration of public policy, providing, in a case of first impression in the state, that the settled rules in regard to "charitable uses" in England, (as distinguished from those adopted by the Scotch, or any other courts) shall apply in New Jersey, that they shall be confined to the enumeration of the statute of Elizabeth, and restrained by the principles declared in *Morice* v. *Bishop of Durham*, and *Williams* v. *Kershaw*.

The legislature may do, by special act, whatever they can accomplish by the provisions or effect of a general law.

XI. The settlement made in this case, in its nature, objects, and results, and the circumstance of its legislative confirmation, appeals to the favor of the court. The court will advance as far as possible to reach and apply every principle to sustain it. Wrong principles will not therefore be announced, but if the application of correct ones seems doubtful, the character of the settlement, and the fact of its legislative confirmation, will decide it.

*Mr. Bradley,* on same side.

The settlement made between the parties in this case ought to be confirmed. It is a family settlement, and addresses itself to the highest favor of the court. It is a valid settlement, and, therefore, it is the duty of the executors to carry it out, in accordance with the wishes of the only parties beneficially interested.

The only question, whether a valid settlement can or cannot be made, arises upon the powers of disposition given to

Mrs. Thomson, the testator's wife. If she can lawfully divest herself of these powers, or if they are void powers, no obstacle stands in the way of a valid settlement of the estate.

I. The first power given to her is that of distributing by will, at her death, a certain fund among the testator's brother and sisters, and their descendants. The fund subjected to this power is, "the portion of the estate appropriated for an income of $10,000 a year for her support." That is to say, the testator gives her $10,000 a year for her support during her life, and gives her power to distribute, among certain of his relations, the fund appropriated for producing this $10,-000 a year. She has the interest, or produce, of this fund during her life, and the power of distributing it at her death. If she does not distribute it, it is to go to the brother and sisters of the testator, who are the testator's next of kin, and with whom the settlement is made.

Such a power is called, in the law books, a power *in gross.* 1 *Sug. on Powers* 44. It differs from a power simply collateral, in that the latter is given to a party who has not, nor ever had, any estate in the land, or interest in the fund. *Ibid.* 45.

A power simply collateral cannot, by any act of the donee, be suspended or extinguished. 1 *Sug. on Powers* 48. But a power in gross, like that in the present case, may be released or extinguished. *Ibid.* 98, 102, and cases there cited; and 2 *Ibid., Appendix No.* 4, *p.* 569.

The argument of Sir John Leach, in *West* v. *Berney,* 1 *Russ. & Myl.* 431, reviewing the previous cases, seems to establish the conclusion reached by him, "that every power reserved to a grantee for life, though not appendant to his own estate, (as a leasing power,) but to take effect after the determination of his own estate, (and, therefore, in gross,) may be extinguished." *p.* 435. He held the same doctrine in *Smith* v. *Death,* 5 *Madd.* 371.

In *Horner* v. *Swan,* 1 *Turn. & Russ.* 430, an estate for life was given to the wife, with power to appoint by will to

and among the children, or their issue; and in default of such will, then to the children;. almost exactly like the terms of the present will. The wife and children undertook to sell the property. The case was ably argued, it being contended, in favor of the title, that the widow, by joining in the sale and conveyance, extinguished the power. Sir Thomas Plumer so decided, following the preceding cases.

In *Bickley* v. *Guest*, 1 *Russ. & Myl.* 440, a father, tenant for life, with power to appoint in favor of children, having levied a fine of the property, afterwards actually attempted to exercise his power by making a will in favor of his children, and the court held it null, as the power was extinguished by the fine.

That the same rule is applied to personal as well as to real estate, is shown by the following extract from *Sugden on Powers, vol. I, p.* 79 : " The same rule is applied to personal estate ; therefore, where a man was, under a will, tenant for life of certain funded property, and then for such persons, &c., as he should appoint by will, and, in default of appointment, the trust was for his executors or administrators, it was held, that he might assign the fund absolutely; and where, in default of appointment, the fund is settled on another, the donee may, with the concurrence of that person, make a present title to the fund; for, by analogy to powers on real estate, such a power may be parted with, that is released or extinguished."

Mr. Sugden refers, for authority, to a manuscript case of *Kirkpatrick* v. *Capel;* but he is himself a great authority on a question of this kind.

The case of *Miles* v. *Knight*, 12 *Jurist* 666, decided by Vice Chancellor Shadwell, in 1848, was very similar, in principle, to the present. In that case, certain consols and reduced annuities were held upon trust to pay the dividends to Eliza Miles for life; after her decease, to any husband surviving her to whom she might appoint the same ; and after his decease, to such children and issue of children as she might, by deed or will, appoint; and, in default of ap-

pointments, then in trust for all her children, equally; if no children, then in trust to pay the trust moneys to such person or persons as she by deed or will might appoint; and, on failure of such appointment, in trust for her next of kin. Eliza Miles having never married, at the age of sixty-seven, by deed-poll, under the last power specified, appointed the whole fund to herself, and disclaimed and renounced and released to the trustee, and all others whom it might concern, all and every power of making appointments to any husband or child, or children or issue, and authorized and requested the trustee to assign the trust securities to herself. Having executed this deed, she filed a bill against the trustee, praying that he might be ordered to transfer the stocks to her accordingly. The case was regularly argued, and the Vice Chancellor made a decree in accordance with the prayer of the bill, and expressed the opinion that it would not be necessary for the complainant to enter into any undertaking to account.

It will be observed that the power under which the donee in the above case, directed the fund to be given to herself, was not to be exercised except on failure of all the prior contingencies named in the trust. Those contingencies were her having children, or her leaving a husband and making an appointment in his favor. She was past the age of child bearing; and therefore, the only outstanding contingency was that of marrying and making an appointment in favor of her husband. The power to make such appointment was renounced and released by her by deed-poll; and the court deemed that release sufficient and decreed the transfer of stock to be made.

In the case before the court, the parties have executed as solemn instruments and assurances as the nature of the case admits of; and are ready to execute such further release and indemnification as may be required to effect the desired purpose; and desire that the entire arrangement may be confirmed by the decree of the court, so as to be a matter of record as well as matter of agreement and assurance.

We, therefore, think that we are justified in concluding that the settlement is valid and final, and that by it the power in question is extinguished.

II. The next power given to Mrs. Thomson, related to the surplus income of the testator's estate, over and above the $10,000 per annum given to her.  The will directs that this surplus shall be invested in good securities, and that the testator's wife shall be authorized and empowered by her last will and testament, to give and devise the same among *such benevolent, religious, or charitable institutions* as she may think proper.

This power is simply collateral, and cannot be released or surrendered.  Viewed, therefore, merely as a power, if it is valid, it will remain an encumbrance on the estate, notwithstanding any settlement the parties can make, unless aided by legislation.  But regarded in the light of a discretionary trust, its validity cannot be defended.  The entire estate is vested in trustees, the portion of it in question being subjected to a discretionary power of Mrs. Thomson to devote it to benevolent, religious, or charitable purposes.  It matters not in whom this discretionary power is lodged; whether in the trustees themselves or in a third person.  The result is the same.  It is that of trust property subjected to a discretionary power of disposition for the purpose named, with an ulterior limitation, if the power be not exercised, to the testator's brother and sisters.

The question is, whether such a discretionary power or trust can be supported as against the ulterior legatees, who, in this case, are the testator's next of kin?  We contend that it cannot; that it is too vague and uncertain.

By the English law (which we have adopted,) a trust which is so vague and indefinite, that courts of equity cannot clearly ascertain either its objects or the persons who are to take, will be held to be void, and the property will fall to the next of kin, or into the general funds of the donor.

This has been expressly decided to be the case where the

terms of the trust are, to dispose of the fund for such uses and purposes as the trustee may see fit, it being left entirely to his discretion ; or, where the trust is, to dispose of so much of the fund as the trustee may see fit, to either branch of the testator's family, as the trustee may deem expedient; and if the trustee should not make such disposition in his lifetime, giving him power to dispose of the same by will to those or either branch of the donor's family ; in all such cases, the trust is void for uncertainty. Some limit must be set to the trustee's discretionary power. See 2 *Story's Eq.*, §§ 979 (*a*) (*b*), (Redfield's ed.)

A gift to a person to be disposed of at his discretion is an absolute gift to such person, it is true ; but when the words of the disposition show the gift is not intended for the personal benefit of the party, but only as a trust for the benefit of others, then the rule applies, that some limit must be set to the discretionary powers of the trustee, or the trust will be void, and the fund may be claimed by the person next entitled.

To this general rule, trusts to charitable uses are an exception. They will be held valid, though expressed and indicated with the greatest generality and vagueness—such as would render any other trust absolutely void. So far is this partiality in favor of charities carried, that if a gift be made without any purpose at all being expressed, except only, in general, that it is intended for *charitable* purposes, or for any general purpose, (such as *religious* or *educational*), which belongs to the category of charitable purposes, still it will be upheld; and if a trustee is appointed with discretionary powers, in such case, he may select the charity to be established, and the manner of carrying it out; but if no trustee be appointed or he fail to act, the King by his sign manual will approve a scheme for a charity. In the latter case, of course, the bequest would fail in this country, for want of a magistrate having the requisite power. 4 *Seld.* 548.

By another rule of the English law, a trust by which property is tied up or devoted to a special purpose for a

longer period than one or more lives, and twenty-one years after their determination, is void, it being held against public policy to allow property thus to be locked up by a perpetual restriction; perpetuities being considered odious in the laws of a commercial and progressive people. *Lewis on Perpetuities.*

An exception to this general rule against perpetuities is also made in the case of *charitable uses.* When property is given to a charitable use, it may be for ever devoted to that use, without any limitation in regard to time. The reason for this exception is, that foundations for the alleviation of misfortune, the promotion of education and religion, and the establishment and support of public edifices and easements, are for the public good, and tend to relieve the public treasury, and to lighten the burdens of taxation.

But the purposes and objects which are *deemed charitable,* and, therefore, entitled to the exemptions above referred to, are limited in number and scope. Not everything that partakes of a benevolent character is to be deemed charitable in the legal sense. Ancient laws and judicial decisions have fixed limits, somewhat definite, to the charities which will be sustained as perpetual foundations. Generally speaking, gifts in aid of the poor, the sick, and the disabled, whether for the establishment of poor-houses, asylums, hospitals, or other means of benefiting them; gifts for the promotion of education or religion, such as the establishment of schools, scholarships, academies, colleges, church edifices, support of ministers, missionaries, &c.; gifts for the public ease and advantage, such as public buildings, houses of correction, construction or repairs of highways, bridges, harbors, seabanks, &c., are held to be charitable uses. In a word, eleemosynary, educational, pious, and public uses, are held to be charitable uses within the beneficial operation of the law. 2 *Story's Eq.*, § 1160.

When, however, the purpose indicated is not a charitable purpose, within the technical meaning of the term; or where a general purpose, merely benevolent, is indicated, or is

allowed to the discretion of the trustee, so that the gift does not, in terms, denote or confine the bequest to a legally charitable purpose, but leaves its destination so much at large that it *may* be directed to an object *not charitable*, without violating the directions of the donor; then the gift will be void, and the legacy will fall to the next of kin, or to the private residuary legatees. 2 *Story's Eq. Jur.*, §§ 1164, 1183; 2 *Redfield on Wills, p.* 830. Not being sustainable as a charity, it will be obnoxious to the objection of uncertainty, or of being an unauthorized perpetuity.

Thus in the case of *Morice* v. *Bishop of Durham*, 9 *Ves.* 399; *S. C.* 10 *Ves.* 539; both Sir William Grant and Lord Eldon held void a gift upon trust to such objects of *benevolence and liberality* as the Bishop of Durham should approve of. Lord Eldon said that the intent of the testatrix did not seem to confine the trustee to such benevolences as the laws of England deem charities, and hence it was too indefinite and void. See 2 *Roper on Leg.* 1238.

In *James* v. *Allen*, 3 *Mer.* 17, the residue of an estate was left to trustees, to be applied by them to such *benevolent* purposes as they, in their discretion, might unanimously agree on. This was held void for uncertainty by Sir William Grant, on the ground that it is impossible to say that every object of a man's benevolence is also an object of his *charity*. The whole property might, consistently with the words of the will, be applied to purposes strictly charitable, but the court could not say that it might not be applied to benevolent purposes which are not strictly charitable. See 2 *Roper on Leg.* 1240; 2 *Story's Eq.*, §§ 1156, 1158.

The case of *Williams* v. *Kershaw*, 5 *Clark & Fin.* 111, decided by Sir C. C. Pepys, in 1835, as the language of the will in that case was construed, was very similar to the case under consideration. There the words were, " in trust for such benevolent, charitable, *and* religious purposes as the executors, in their discretion, should think most advantageous and beneficial." The Master of the Rolls construed the word " *and* " to mean " *or*," which made the language the same as

that which is actually used in Mr. Thomson's will. Having given this construction to the language, he held, that so great a latitude of discretion was given to the trustee, that he might devote the fund to purposes merely *benevolent,* without being religious or charitable; and if so, the bequest was void, for vagueness and generality.

No subsequent case, to my knowledge, has overruled this one. Sir C. C. Pepys, when he became Lord Chancellor Cottenham, followed it in *Ellis* v. *Selby,* 1 *Myl. & Cr.* 286, and it is affirmed in *Williams* v. *Williams,* 5 *Law Journ., ch.* 84.

Mr. Boyle, in his treatise on charities, questions the correctness of the construction put upon the words in the last case, in changing them from a conjunctive to a distributive or alternate signification; but supposing the construction to have been right, he does not question the law of the case; on the contrary, he admits it to be as laid down by the Master of the Rolls. See *Boyle on Charities, bk. II., ch. V.,* 281, 284; especially 293.

Chief Justice Redfield, in his edition of *Story's Eq. Jur.,* in a note to *Vol.* 2, § 1164, *pp.* 378, 379, 380, gives a condensed list of donative expressions, which are held to have been void, and as not raising a charitable use, and a corresponding list of such as have been sustained as indicating it with sufficient certainty. This list brings the cases down to the present time; and no case is cited by him, except Scotch cases, which is adverse to that of *Williams* v. *Kershaw.*

The Scotch law is more liberal than the English in sustaining gifts of a general benevolent character. By that law the gift in question would be sustained. *Miller* v. *Rowan,* 5 *Clark & Fin.* 99, is a Scotch case, in which the words, *" such benevolent and charitable purposes as they think proper,"* were held sufficient.

We think, however, there can be no doubt that our courts will feel bound by the English decisions. It is true they are not controlled by the express regulations of the Statute of Charitable Uses, 43 *Eliz.;* but they regard themselves as

subject to the general principles of that system of charity law which has grown up in the English courts, whether on the original foundation of the common law, or under the directions of the statute; and the tendency is rather to stop short of the English cases, than to go beyond them in sustaining charitable bequests. See 2 *Story's Eq. Jur.*, §§ 1155, 1164.

Judge Denio, in the case of *Williams* v. *Williams*, 4 *Selden* 547-8, says: "In this country, the question whether a gift to a particular purpose is a valid charitable gift, is to be resolved by a reference to the determinations of the English Court of Chancery, whether that court reposed itself upon parliamentary definition, or arrived at its judgment in any other manner." See *Howard* v. *American Soc.*, 49 *Maine* 298.

It is not overlooked that in the case before us, the testator's wife is authorized and empowered by her last will and testament, to give and devise the fund in question among such benevolent, religious, or charitable institutions as she may think proper.

It may be said, that the power to give to *institutions* distinguishes the case from gift to charitable or benevolent uses generally. I do not see how any such distinction, favorable to the validity of the bequest, can be made. Any *institution* in whose favor the appointment might be made, would be only a trustee for carrying out its objects; and if those objects should be merely *benevolent* and not *charitable*, the execution of the power would be a bequest of the fund to a trustee, for the *benevolent* purposes which that trustee was created to promote. So that it comes back to the same thing as if the power had been to give the fund to such *benevolent* purposes as the widow might think proper.

Again, the word "institutions" may mean corporations, or voluntary associations. We have then another element of vagueness which adds to the difficulty of the case. If, by the terms of the will, the widow may give the fund to a voluntary association, formed for a benevolent, though not a

charitable purpose; and thus place the property in a position to require the administration of the Court of Chancery, in a manner, and for a purpose, which the court does not recognize, such a court can never sustain the trust or authority given.    The next of kin, or residuary legatees, will be entitled to the fund.

We conclude, therefore, that the discretionary power in question, being in the alternative, and enabling the widow to devote the entire fund in question to a purpose which she may deem merely *benevolent*, is void for vagueness and uncertainty; and therefore, that the arrangement which the parties have made is free from any embarrassment arising from that power or trust.

III. But if the argument respecting the validity of the last mentioned power is not conclusive, the legislative act passed to confirm the settlement, and to enable Mrs. Thomson to relinquish the power, removes all doubt and difficulty.

No one can object to this act but Mrs. Thomson herself: for no one else has any vested interest; and she joins in the agreement and acquiesces in the act.    So that, if the possession of the power is of any interest or advantage to her, she has waived all objections to its extinguishment.

If, on the other hand, as we suppose is the case, the power is of no legal interest or advantage to her, but she is to be regarded as the mere instrument, or hand, by which the testator's benevolence may be carried into effect, then it is perfectly competent for the sovereign power of the state to authorize the extinguishment or release of the power; for to that sovereign, as the guardian of all public interests, belongs the administration of all charities, especially those of an undefined character.

Even in cases of private right, where no interest has become vested, the legislature may alter the devolution of estates, as in the case of estates tail.    In a recent case, *Croxall* v. *Sherrerd*, 5 *Wall.*, *p.* 268, the Supreme Court of the United States decided to be valid a law of this state

which confirmed a family settlement, that changed an estate tail to a fee simple, and thereby diverted the entire devolution of the property from a prescribed line of single heirs at common law to the children in common as heirs general under the statute of descents. The next heir in tail complained of this extinguishment of his entailment, and brought an action for the property. But the court held that as he had no interest when the act was passed, he was concluded by it.

Family settlements are always regarded with strong favor. 1 *Story's Eq. Jur.*, §§ 129–131.

*Hon. Wm. A. Porter,* (of Philadelphia,) for Mrs. Thomson, appellant, in reply.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

The widow and next of kin of the late John R. Thomson, claim in this suit the right, certain specific and pecuniary legacies having been paid, to dispense with his will, and distribute among themselves, in proportions which they have agreed upon, the entire residue of his estate. In pursuance of this view of their rights, these parties entered into an agreement under seal, by force of which the widow is to take two thirds of this residue of the property, and the next of kin, being the brother and three sisters of the testator, the remaining third part. It was to enforce this contract against Mr. Thomson's executors and trustees, that the bill in this cause was filed.

The argument, before this court, in behalf of the complainants went upon three grounds: first, that one of the provisions of the will was, from an intrinsic defect, invalid; second, that a power of appointment conferred by the will upon the widow, could be legally released by her; and third, that at all events, the contract between the widow and next

2 x *

of kin had been legalized by an act of the legislature of this state.

The first of the grounds thus taken, has reference to that clause of the will which, with regard to a certain portion of the accumulated income of the estate, declares, that the testator's widow "shall be authorized and empowered, by her last will and testament, to give and devise the same among such benevolent, religious, or charitable institutions as she may think proper." Such a bequest, upon the most familiar principles, is not to be sustained except upon the theory that it constitutes a gift to a charitable use. Is the purpose indicated, then, a charity in a legal point of view? I do not understand that there is any difference whatever between the common law of England and the law of this state upon the point as to what constitutes the legal definition of a charity. And by this common law I mean that system, so far as respects this question, which has grown up in a series of decisions founded, in part, upon the 43d of Elizabeth, ch. 4, (the statute of charitable uses). The doctrine of the English Court of Chancery with regard to the mere classification of things which are, and those which are not, charities in the eye of the law, has been very generally recognized in this country. The discrepancy between the English and American systems regulating charities, consists in this, that in England a bequest for a charity will be effectuated no matter how uncertain the objects or the persons may be, or whether the bequest can be carried into exact execution or not, for when a literal execution becomes impracticable, the court will administer it on the doctrine of *cy pres*. In some instances courts of this country have refused to exercise so extensive a jurisdiction. I am not aware, that in our own courts, this subject has received any elucidation. It may well be, therefore, that a bequest, obviously for a charity, and which in England would be carried into effect, might not be enforced in our own courts, on the ground of the indefiniteness of its objects or the impracticability of its exact execution. But this is a diversity of legal administra-

tion, and not of legal classification. Upon the questions what is, or what is not, a charitable use we have no criterion but the rules of the common law, and those rules, consequently, are obligatory upon us.

Accepting this guide I readily come, on this head, to the same conclusion with the Chancellor. The bequest is to "*benevolent,* religious, or charitable institutions." This is too broad. Benevolence is wider than charity in its legal signification. In *James* v. *Allen,* 3 *Mer.* 17, the will gave property to "be applied and disposed of for, and to such *benevolent* purposes*" as the executors, in their discretion, might unanimously agree on. Sir William Grant, Master of the Rolls, decided this bequest void, remarking, "that although many charitable institutions are very properly called benevolent, it is impossible to say that every object of a man's benevolence is also an object of his charity." The ground of the decision was, that as the bequest could, consistently with the will, be applied to other than strictly charitable purposes, the court could not execute the trust. In *Williams* v. *Kershaw,* 5 *Clark & Fin.* 111, *note,* the devise was to "such benevolent, charitable, and religious purposes as the executors should, in their discretion, think most advantageous and beneficial." Upon a review of the authorities the decision of Lord Cottenham was, that the introduction of the word "benevolent" rendered the purposes of the testator too indefinite for judicial execution, and that the gift could not take effect. *Ellis* v. *Selby,* 1 *Myl. & Craig* 286, and *Williams* v. *Williams,* 5 *Law Journal, ch.* 4, are cases holding a similar doctrine, and are much in point. Many other decisions to the same effect will be found collected in 2 *Roper on Leg.* 1237. These decisions appear to me to rest on a proper foundation. It is important that the fact as to what are legal charities, which will be executed by the courts, should be settled. To sanction the introduction of a general term of so wide a signification as the word "benevolent" would have a tendency to involve the subject in much confusion.

Upon the argument, the counsel for the respondent laid some stress on the use, in the testamentary clause, of the word "institutions." But, upon reflection, I am unable to see that this term has a tendency to give definiteness to the expression of the use intended. If, in legal contemplation, a benevolent purpose is more indefinite, embracing a larger class of objects, than a charitable purpose, it seems to follow, necessarily, that a benevolent institution may not, in a legal sense, be a charitable institution. An institution is a mere organism for the accomplishment of an object, and the existence of such organism cannot, in the nature of things, make such object definite. To make the argument of any value it should appear that the class of benevolent purposes, which are not comprehended in the definition of legal charities, are not and cannot be executed by institutions, that is, associations of persons. In *Babb* v. *Reed*, 5 *Rawle* 151, it was held that an association for the purposes of mutual benevolence among its members, is not an association for charitable uses. Here, then, was a benevolent institution which was not a charitable one. Other similar instances will readily suggest themselves. I think the word in question does not restrict the meaning of the term " benevolent " in the clause under consideration.

As I have already said, I concur in the conclusion that the disposition comprised in this clause of the will, on the ground just specified, is invalid.

The second point relates to the capacity of the widow to surrender her power of appointment over that portion of the estate which is set apart for the raising of her income.

This branch of the case was disposed of by the Chancellor, on the technical distinction which, in the doctrine of powers, exists between a power in gross and a power simply collateral. The power of appointment contained in the clause of the will now alluded to, was regarded as belonging to the former class, and, consequently, as extinguishable by the donee of the power. This question seems to me to be one of great nicety in the application of the decisions to the

present case. I have not found any case in which it was maintained that a power to appoint to *strangers,* after the expiration of an interest given to the donee of the power, was a power in gross. The decisions referred to by counsel are mostly cases of settlement on a parent, with a power of appointment among his children. In such instances, there is some reason to say the power is not simply collateral, because it is not a naked authority, the father having an interest in the distribution of the estate among his children. Under such circumstances, such a power may not inaptly, in the expression of Sir Edward Sugden, be called "an emolument of his own estate." But, on the contrary, when an interest, for life or for years, is given to A, with direction, by will or otherwise, to appoint between B and C, who are strangers to A, why such an authority should be considered anything more than an authority simply collateral, it seems difficult to imagine. I have found no case which determines this question either way; those cases in which the fund, on failure of appointment, is given to the donee of the power, resting obviously on a different principle; and I shall pass the question without the expression of any opinion upon it. I am enabled to do this because, in my examination of the matters involved, I have come to the conclusion, that there is an insuperable difficulty in granting to the complainants the relief prayed for, so far as their claim to such relief rests on general legal principles.

For the purpose of considering the difficulty thus intimated, I shall assume that the power in question is one in gross, and one, consequently, that Mrs. Thomson could legally release. The proposition then arises, can she release it for a consideration? In order to comprehend fully the force of this inquiry, we must place before our minds distinctly the circumstances of her position. Her authority is given to her in the following terms: "And I authorize and empower my said wife, by her last will and testament, duly executed, to direct, limit or appoint, give or devise the portion of my estate so appropriated for an income of $10,000 a year for

her support, to give or devise the same to and among all
and every the children of my sisters, Caroline Norris and
Amelia Reed, and their children, in such proportions and
for such estate or estates as she may think proper; or, if my
wife so chooses, she may, by her last will and testament
aforesaid, direct, limit or appoint, give or devise the same to
and among my sisters, Caroline, Adeline, and Amelia, and
their children and grandchildren, and my brother, Edward,
in such proportions and for such estate or estates as she may
think proper."

It will be observed, from this quotation from the will, that
as appointees the children and grandchildren of Mrs. Norris
and Mrs. Read are peculiarly favored. Mrs. Thomson had
the right to appoint the whole of this part of the estate to
them. In no distribution which she is authorized to make,
could they or any of them be omitted. By the arrangement
which she has, in point of fact, made with the brother and
three sisters of the testator, these children are cut off from
all possibility of taking any benefit under an appointment.
Both the bill of complaint and the articles of agreement state
that Mrs. Thomson consented to extinguish the power of
appointment in consideration of the division of the residue of
the estate, after the payment of specific and pecuniary
legacies, by which division two thirds of such residue became
her own, absolutely. The children of the sisters of the tes-
tator are no parties to this contract. In considering the
legal maxim involved it must be treated, then, as a case in
which a donee of a power has agreed, for a benefit moving to
herself, to surrender her right to appoint.

Can any plausibility be given to such a claim? A power
to appoint is not a technical trust it is true, because the
possible beneficiary has not the capacity to call for its exe-
cution. But it has never been doubted that such a function
was a confidence, and as such cannot be made the subject of
barter. Courts of equity have very characteristically exer-
cised the keenest vigilance over this class of agents. The
principle which I regard as established is, that they shall

gain no profit by force of their position. Any other rule would be impracticable. If it be lawful for the donee of a power to bargain for his own personal ends with a part of the appointees to exercise his authority in a certain mode, or to stipulate with the heirs-at-law or the next of kin to disappoint the expectations of the appointees by a surrender of his power, it is obvious in numerous cases the bulk of the fiduciary property would enure to the benefit of the donees themselves. It is on this obvious ground that courts everywhere have been strenuous in enforcing the utmost good faith on the part of donees of powers. I think no case can be found in which such donee has been allowed to make his position, by any device, profitable to himself. Such is the uniform language of the authorities. In *Aleyn* v. *Belchier*, 1 *Eden* 132, a power of jointuring having been executed in favor of a wife, but with an agreement that the wife should receive only a part as an annuity for her own benefit, and that the residue should be applied to the payment of the husband's debts, such arrangement was held a fraud upon the power, the Lord Keeper saying, that "no point is better established than that a person having a power must execute it *bona fide* for the end designed, otherwise it is corrupt and void." And upon the same principle it has been settled, in a series of cases, that whenever an appointment is made to one or more of a class, in exclusion of others, upon a bargain for the advantage of the appointor, equity will relieve against such an appointment as a fraud upon the power. In one of this class of cases, *Rowley* v. *Rowley*, *Kay* 242, Sir W. Page Wood, V. C., said: "I think it would be impossible to contend, if a direct bribe were given to the appointor, though out of a separate fund, that the appointment could be upheld in favor of a party to whom the fund, subject to the appointment, was given." And in *McQueen* v. *Farquhar*, 11 *Ves.* 479, Lord Eldon remarks: "It is truly said, this court will not permit a party to execute a power for his own benefit." A large number of cases illustrative of the same rule may be found in 1 *Lead. Cas. in Eq.* 304.

These authorities abundantly suffice to show that the principle is unquestionably established, that an appointment to further the selfish interest of the donee of the power will not stand.    The doctrine rests upon the ground of the existence of constructive bad faith towards the donor of the power.    And a gainful agreement to refrain altogether from the exercise of the power is necessarily equally fraudulent; it involves, no matter how pure the intentions of all parties may be, a constructive fraud.    In *Cunynghame* v. *Thurlow*, (note to *West* v. *Berney*,) 1 *Russ. & My.* 431, the case of a release of a power to appoint was prevented, the donee gaining an advantage from such release.    In this case, a fund was limited to a father for life, with remainder to his children in such shares as he should appoint, and in default of appointment, to the children equally; the father released the power as to a portion of the fund, so as to vest a share of it in himself, as executor of a deceased son, who in default of appointment, took a vested interest; but the court refused to order the transfer of this share to the father.    It will be observed that in the case cited the father had the undoubted right to extinguish his power of appointment; but as he did this in consideration of a benefit to himself the act was declared illegal.    The principle of this case applies, with entire aptness, to the facts contained in the bill now before this court.    I feel constrained to say, therefore, that in my opinion, a court of equity cannot sanction the contract which these parties have entered into, on any of the principles which usually regulate the relations of parties having an interest under a power of appointment.    And as an evidence of the strength of my own conviction on this subject, I may remark that I have been led to this result notwithstanding my most perfect confidence that the agreement thus impeached in point of law, has been entered into in entire good faith by all the parties to it.    I am entirely satisfied that the interest of the other appointees has not in the least degree been sacrificed, but has been scrupulously considered. Nor have I entertained the faintest suspicion that the donee

of the power in this case has taken any advantage whatever of the position in which she was placed by her husband. I am persuaded that the agreement in question was intended to be, what it purports to be, a fair family settlement. My difficulty has been to find any legal general ground of equity on which to rest a claim in favor of the case made by the bill.

Before leaving this head of the case, it is proper to remark that I have assumed that one or more of the sisters of the testator has children living. This fact was stated on the argument. The pleadings are silent upon the subject, but, as the existence of such children is not negatived in the bill, the presumption must be in favor of their existence, on the principle that the complainants are bound to make out all the necessary circumstances on which their title to relief rests.

The only remaining foundation for the case of the complainants is the act of the legislature in confirmation of the agreement mentioned in the bill. There are but very few of these acts of special legislation which I regard as possessed of any legal validity. It does not seem to me that their inefficacy arises merely when they conflict with the positive prohibitions of the constitution, or when they disturb vested estates. As a general rule, I think they cannot meddle with vested rights. I have no belief that, by a special act, a man's right or expectancy to a contingent remainder, or under an executory devise, can be cut off. Nevertheless, there are some cases in which, from ancient custom, a power of special legislation may be said to subsist as a function of the law making power. The extent of such right will be always questionable. In the present instance, the right to be affected by the act is very remote, and of the most contingent character. These children and grandchildren, whose rights alone are affected by the statute in question, have no interest which is capable of being enforced in any court, unless they should first obtain an appointment in their favor. Their interest, then, is the mere possibility that Mrs. Thomson, in derogation of her agreement with their parents, should appoint a

part of this fund to them. It may be that, against such a mere possibility, this act of the legislature should prevail. The decision of the Chancellor is in favor of its efficiency for the purpose designed; and leaning, in a great measure, on that opinion, I shall, on this ground, vote for the affirmance of the decree rendered in the Court of Chancery.

The decree was affirmed by the following vote:

*For affirmance*—BEASLEY, C. J., BEDLE, CLEMENT, DAL-RIMPLE, DEPUE, KENNEDY, OGDEN, WALES, WOODHULL.    9.

*For reversal*—OLDEN.